Mr. Castor, you may begin. Thank you, Your Honor. Jim Castor for the appellant, Joseph Carrillo. Good morning. The district court ruled on a single issue at the end of the day. The court said the inquiry ends with the plaintiff not being perceived as disabled. Thus, the plaintiff, according to the district court, is not protected by the ADA. That conclusion is error. I cite three things to say that is error. First, the legislative history of the 2008 amendments. Second, the text of the amendment and specifically as it relates to the definition of perceived disability and third, that the court relied on overruled and out-of-circuit authority from the Tenth Circuit, the Jones case. Let me begin with the Jones case and the case law. A 2007 case from the Tenth Circuit, which cited to and relied on the Sutton analysis, which was based on the proposition that in order for an employer to have regarded someone or perceived someone as disabled, they had to rely on myths or stereotypes. That analysis was specifically addressed by Congress in 2008 in the Act of September 25th of 2008 on the first page of the Act. The court disapproved of the Sutton analysis, specifically saying the holdings of the Supreme Court in Sutton and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection from many individuals whom Congress intended to protect. By name, the Congress in 2008 rejected the analysis that the district court relied on. The district court also did not cite compelling authority from this circuit, the Fifth Circuit, the Rodriguez case from 2006, which talks about the necessity for an individualized analysis and says that the issue of animus is not required, that ill will is of no moment. The Cannon case from 2016, which talks about the qualification requirement and specifically talks about the 2008 amendments and perceived disability and how expansively that is to be defined. And additionally, the 2019 Null case, which talks about the fact that pretext alone is enough to defeat the issue of the required animus. That is, of course, consistent with Reeves v. Sanderson, the unanimous decision from the United States Supreme Court. We back up just a little bit so that I'm clear, and maybe it's just me from reading the briefs. Is the plaintiff's, the gravamen of the complaint is that he is not disabled but has been treated as such and it has cost him his position? Or is it that he is disabled somehow, and we'll talk about the doctors in a minute, but he is disabled but did not get an accommodation that he believes he's legally entitled to? Well, Your Honor, the claim in the complaint is that he was perceived to be disabled, and that is based upon the action taken by the employer in this case. With respect to the issue of accommodation, there's a debate in the courts about whether an accommodation is required for someone who is perceived to be disabled but not actually disabled. But yes, I hope I addressed the court's question. Yes, thank you. Can I ask a follow-up question? Sure. Is your client's position that if he'd had a seizure, he would have been disabled? I understand the argument that he didn't have a seizure, but if he'd had a seizure, do you think that he is disabled or was disabled? I mean, I don't know the answer to that question. It's an interesting question. It's obviously not presented here because we don't believe he had a seizure. But if he did have a seizure, we believe he certainly could have continued to do his job as a diesel electrician. Is your view, if he had a seizure, that he could have continued to do his job as a diesel electrician, including moving trains? Your Honor, the requirement of moving trains needs to be addressed in context. First of all, in the Cannon case, they talked about a field engineer and whether that field engineer required driving, whether that was an essential job duty or was it a marginal job duty. Mr. Carrillo fixed diesel electricity within the diesel cab, in a stationary cab, in a maintenance facility that is mostly in a building. But in any case, they could drive a locomotive in pairs up to five miles an hour on this facility which has one track going in and one track going out, protected by derails. There is no requirement for who has to drive the train. What kind of evidence did you put into the record, and could you point it to me, of the I don't think that there's a specific statement about the number of times that a person moved a train. But the question is, if he moves a train, he moves it in pairs. He can be on the ground and the other person can be driving. There's no requirement for him to drive the train. And that is a very small part of their responsibilities. They're fixing the electric components within a stationary cab. When you say moving in pairs, do you mean one in the cab, one on the ground, or do you mean two people? That's exactly what I mean, Your Honor. So does that mean that sometimes someone else would be on the ground and he'd be in the cab? It could be, but there's no requirement that he be in the cab, for example. But the idea is that different diesel electricians, they would work in pairs, one would be on the ground. Because that strikes me that that would hurt you more than help you. If someone is seizure-prone in the cab and another colleague is on the ground, it doesn't I'm not sure how, maybe I'm misunderstanding what you're saying. Well, Your Honor, the fact is that he doesn't have to drive the train. The person on the ground gives potentially signals to the person. They're not really driving a train. The employer in this case put on the fitness for duty evaluation that he's a conductor. That's the basis upon which they disqualified him, as a conductor. He is not a conductor. He has never been a conductor. That just demonstrates the lack of individualized analysis that they did here. He's a diesel electrician. He fixes the electrical components in a stationary cab. That's the vast majority of what he does. I would argue that under the Cannon case, the issue of him driving is a marginal responsibility and not an essential responsibility, according to this court's decision in Cannon. The second basis upon which the court's analysis was in error is under the legislative history, which is crystal clear. Naming Sutton by name and that analysis by name in the amendment in September of 2008, the Congress said that the ADA should be subject to broad interpretation and broad coverage. The issue of disability or perceived disability should not demand extensive analysis. That the cases in the past have focused on whether or not the person is protected by the act, which is what occurred here, when they should be focused on the employer conduct. That's what the legislative history says clearly. One of the things that this act did in September of 2008 is they commanded the EEOC to write new guidance, interpretive guidance, that would lay out what is intended by Congress in this broad coverage for perceived disability. These are the examples that they provided. They included the fact that an applicant who had a skin graft, that the employer thought meant something more, that maybe it meant cancer, that that person is perceived to be disabled, that terminating an employee with an objectively minor and transitory hand wound, that the employer thought was symptomatic of HIV is enough to perceive the employee as disabled. This was what the interpretive guidance specifically says. And as to an argument they've raised for the first time on this appeal, that is some kind of future risk and not the fact that he was disabled at the time, the interpretive guidance uses this example. An employee with angina is terminated because the employer perceives a risk of sudden incapacitation in the future. That employee is perceived to be disabled. Counsel, let me ask you about the perception. There are several doctors involved, and as you point out in your brief, some of them, particularly ones relied upon by the defendant, reviewed medical records and did not conduct an examination of the plaintiff themselves. Did any of the doctors in this case give the plaintiff a clean bill of health and represent that he was entirely suited to go back to work and perform all of the obligations and responsibilities of his employment? Your Honor, thank you for the question. And obviously in some circumstances a very important question, not here. And let me just explain why. In the last doctor visit from Dr. Aguilar in January of 2018, now Dr. Aguilar is the neurologist that he saw that went through the various tests. All the objective tests, the EEG, the MRI, showed no seizure activity, something that is completely ignored by Union Pacific. But in any case, the issue of clearance in the class action from which this case arises, Harris v. Union Pacific, at docket reference 24838, Dr. Holland testified, he's the chief medical officer, no one ever asked the treaters in this case for a clearance from Union Pacific. Union Pacific does not care about what the treaters say about somebody coming back to work. They don't regard the treaters as being competent to represent whether a railroader can work in the railroad industry. Let me, do I understand from your answer, I do understand your answer, do I understand that the answer to my question is that no, there is no report or medical record or anything from a doctor, including the treating physician, his own doctor, that says he's fully capable of returning to all of his job responsibilities? The answer to that question precisely is no, Your Honor. But let me just go to the January 2018. It just seems kind of mystifying. It's almost mystifying that he had this event and then he's had these doctors examine him and then the other doctors review the medical records, but it doesn't seem as though they ever put their finger on what exactly happened and what the upshot of it is. In other words, is it just an isolated event or is it something that should be of concern in the future? Well, Your Honor, that's obviously an important question here, but in the January 2018 visit from Dr. Aguilar, Dr. Aguilar had previously put driving restrictions on Mr. Carrillo. You see none of those in the last visit. They are not asked that specific question about whether or not he can return to work. Now the same question that Judge Inglehart has, because I take your point about Union Pacific's doctors, but in a case like Knoll and in your case, the plaintiff also has doctors and Dr. Devereaux testifies at page 1180 of the record on appeal that the seizure diagnosis was quote not unreasonable based on the information available. That's your doctor. So I'm not, I don't understand the position if, I mean, I can take the criticisms of the railroad, but to Judge Inglehart's point, I share exactly the same concern. I would think that your doctors could say this was a, you know, it was hypoglycemia. It was stress. It was, you know, but instead you have a, you have record evidence, not unreasonable based on the information available. What I'm not sure what we can do with that. Dr. Deb, that's one half of Dr. Devereaux testimony. What Dr. Devereaux says is that it was a mistake oversight not to talk to the eyewitness. Their doctor, their expert, Dr. Deasing also says that the person who experienced the seizure is not an accurate narrator of what happened. So Dr. Devereaux, if I may finish your honor, Dr. Devereaux says specifically that if you talk to the only eyewitness, Tara Carrillo, who describes what did happen. See, the medical records contain a narrative that he's unconscious for five minutes. Tara Carrillo testified he got out of bed at 4.45 in the morning on June 28th of 2017 and he fell. He made a grunting or snoring sound. She got up immediately, went to his side. He was unconscious for maybe 30 seconds. Dr. Deasing said the records reflect that he was dehydrated and ill before that. Is it an isolated circumstance? Dr. Devereaux says you have to talk to the eyewitness. Dr. Deasing said that gold standard is a video recording. Well, obviously there's no video recording. But if you talk to the eyewitness, which they did during the course of discovery, of course they took her deposition because she was the only eyewitness. And if you put that in context, what Dr. Deasing is saying, they want to cite to the half where he says if you rely just on the medical records, that's not an unreasonable conclusion. But when you consider what happened, it is. That's what Dr. Devereaux says. You have to talk to the eyewitness. And him being out of unconscious for 30 seconds is symptomatic of fainting. Not a seizure. Thank you. You saved some time for rebuttal. Oh, thank you. I didn't realize I was out of time. That's all right. You answered the question, so that's fine. Okay, Mr. Ortfels. Morning, Your Honors, and may it please the Court. The District Court correctly held that Mr. Carrillo cannot prove discriminatory intent. This is the dispositive issue on this appeal. This Court can affirm the District Court's judgment without deciding any other issue on this appeal. It's an essential element of Mr. Carrillo's claim under the ADA of disparate treatment to prove Union Pacific's subjective intent to discriminate. They can do this either indirectly through the McDonnell-Douglas framework or directly through direct evidence. Counselor, do you think there is anything suspect in the District Court's opinion, or I should say its analysis, set forth in the opinion along the lines that your opponent is suggesting about the 2008 statute and the post-Sutton analysis? Do you think the District Court got that right and that you disagree with your opponent, or are you arguing that the District Court might have gotten the analysis wrong using the older case law, but I win anyway? The position is, well, there's two different things. The Sutton analysis that Mr. Caster is arguing, and whether or not Mr. Carrillo was regarded by Union Pacific as disabled, basically regarded as having a physical impairment, that's a different element of the essential elements that they have to prove. That's the element of disability. The District Court actually made two findings in this case, in its opinion. It made the finding of no disability based on a regarded as theory, and it made the finding of no discriminatory intent, because the plaintiffs had not provided direct evidence of discrimination, and they had abandoned a McDonnell-Douglas framework in their opposition to summary judgment. So the answer, Your Honor, is the District Court was correct. His analysis was correct on the discriminatory intent piece. We also argue in the brief that the District Court is correct on the regarded as piece, but we're not asking this court in any way to deviate or look past the District Court's analysis. It was spot on with respect to discriminatory intent and direct evidence. And the conclusion that a fitness for duty determination is not direct evidence of discrimination was absolutely correct. Evaluating an employee's medical condition during a fit-for-duty process to ensure their condition doesn't interfere with workplace safety is neither an improper criterion or an adverse employment action. The ADA expressly authorizes employers to inquire about an employee's ability to perform their job-related functions. It expressly permits employers to make inquiries or require fitness-for-duty examinations where there's a need to determine whether an employee is still able to perform their essential job functions. And here, in their reply brief, Mr. Carrillo admits that it wasn't unlawful for Union Pacific to require him to go through a fitness-for-duty evaluation after his loss of consciousness. But what happened during that fit-for-duty evaluation wasn't direct evidence of discriminatory animus. Mr. Carrillo contends that Dr. Charbonneau displayed discriminatory animus in stating in a medical comment that the employee remains not fit for duty and the available documentation points to a seizure. As we pointed out in the brief, this comment as direct evidence was not raised in the argument section of their opposition to summary judgment. It's raised for the first time for appeal as a basis for direct evidence. On that basis alone, the court can disregard it. But even if the court considers it, there's nothing in that comment that proves discriminatory animus without an inference or presumption. First, the comment was made in a medical comment note while the fitness-for-duty evaluation was ongoing. Dr. Charbonneau had just reviewed the medical records for Mr. Carrillo's neurologist and primary care provider regarding his loss of consciousness, and what he actually noted was, the employee is still on activity restrictions for driving and safety-sensitive activities, those restrictions that Dr. Aguiar had placed on him, typical seizure precautions. At that point, Mr. Carrillo had been referred by Dr. Aguiar to the Mayo Clinic for follow-up examination because Dr. Aguiar was having difficulty coming to a conclusive diagnosis. Dr. Charbonneau notes, he's still set to be seen for a follow-up with Dr. Aguiar, and so, yeah, he's still not fit for duty. We haven't come to a determination yet. As part of the evaluation, did your client or the doctors who were working on behalf of your client in conducting the evaluation, did they seek to do a personal exam, especially in a case like this where there's some mysterious, there's a medical event of some sort, and then there's an inability to ascertain with medical certainty what that event is and what the upshot, long-term, it's going to be. Did your clients seek to or have an opportunity to conduct a personal medical exam of the plaintiff? Dr. Holland and Dr. Charbonneau did not personally themselves conduct a medical exam of the plaintiff. What they did do, however, is when the plaintiff reported a loss of consciousness and stated it was possibly due to a seizure and he was placed in the fit-for-duty review, Dr. Charbonneau, after getting some additional information, said the plaintiff needs to undergo a cardiac evaluation and a neurological evaluation, and that's what led to Mr. Carrillo's referrals to Dr. Mata and Dr. Aguiar. So, no, Dr. Charbonneau and Dr. Holland didn't physically examine them themselves, but they instructed him on what examination was needed, and those are the examinations that Mr. Carrillo went and got. So those two doctors, the last two you mentioned, did examine him? Correct. And as Mr. Castor mentioned, they performed a battery of tests on him, and while the tests, the neurological tests that came out as normal, the evidence of the record and the evidence of the cases with respect to a sudden onset, unprovoked seizure, those normal medical testing results don't actually rule out that a seizure actually occurred. Seizures can still occur without showing up in their medical testing, and that's why, even though the medical testing results were normal, Dr. Aguiar kept Mr. Carrillo on seizure precautions, because he had not, despite those normal tests, ruled out that he had had a single unprovoked seizure, and in fact, Dr. Aguiar never ruled it out. Essentially, Dr. Aguiar's care of Mr. Carrillo fell off because Mr. Carrillo never went to the Mayo Clinic as he was referred to do, and so Dr. Aguiar hit a point where there was nothing else he could do for him. Do you agree with the contention of the plaintiff that the restrictions your client put on his viability as an employee basically eliminates any possible position with the company? No, I do not agree that that is the case. For one thing, Mr. Carrillo was referred into the Vocational Rehabilitation Program, which was specifically designed to look for other positions in the company that he could do consistent with his work restrictions. Mr. Carrillo just didn't participate in it. That's in the record? Yes. And then, with respect to the restrictions themselves, it's an important distinction in a direct evidence context that neither Dr. Charbonneau nor Dr. Holland ever said, we are issuing these restrictions because we don't want you to work here anymore, or we're ending your employment because you had a seizure. That's not what happened. What happened is a medical review took place, including the referral to an outside board-certified neurologist, actually twice over, one to Dr. Aguiar, but then to Dr. Frankel as well. And the report back from Dr. Frankel is, based on the circumstances surrounding the loss of consciousness as described in the various medical records, it was most likely a single unprovoked seizure. And so from there, Dr. Holland is looking at, okay, we know when somebody has a sudden onset single unprovoked seizure that the risk of future sudden incapacitation over the immediate five years following that event is about 30 to 35 percent, which, by the way, is about 500 times more likely than an average person walking around would have as a risk of a seizure. The normal kind of background seizure risk is 4 one-hundredths to 6 one-hundredths of a percent at any given point in time. And so looking at those risks, and looking at duties that exist within a railroad environment, I'm going to put functional work restrictions. But then the manager in the field is going to look at those restrictions, compare them to what you do in terms of your essential job functions, and determine whether or not you can do your essential job duties consistent with those restrictions. And that's exactly what happened here. The idea that Dr. Holland somehow knew or did know that by placing those restrictions on Mr. Carrillo, he would no longer work at Union Pacific Railroad Company requires an inference and a presumption. It requires you to presume that Dr. Holland imposed those restrictions with the intent of ending Mr. Carrillo's job. And that is not the case. It is not the same as a supervisor telling his female employee she wouldn't be worth as much as men would be to the bank, and she would be paid less because she was a woman, as was the case in the Portis case. It's not the same as saying, from a manager saying he didn't allow a dark-skinned black person to handle any money at the casino, as in the Etienne case. These just are not the same things, because saying you can't work here if you have a seizure, in and of itself, says the intent to discriminate, based on a protected characteristic. Saying during a medical review, which is, by the way, lawful to conduct. It's undisputed that it is lawful to conduct a medical review. Saying there are risks associated that we've concluded based on the medical review, and we are imposing restrictions. That is not the same. And indeed, the Nall case is instructive in that point. There the employee underwent a field evaluation. There was evidence that after he failed, one of the parties present at the evaluation said, you're never going to work here again. One of the doctors for BNSF said, you know, Parkinson's basically lasts forever. And yet, those things were not direct evidence of discrimination. Now, there were issues in the record that led the court to find there was a pretext issue. But that's not before this court, because they've waived, they've waived pretext. And this case is not analogous to the Rodriguez case. You know, the Seventh Circuit in Matthews, I think, has really summed up the difference between direct and indirect evidence very well, where it said, the employer who fires the worker because the worker is diabetic violates the act. The employer that fires the worker because the worker can't do their job, even if they can't do their job because of their diabetes, doesn't violate the act. And that's the Rodriguez case. Because ultimately, in Rodriguez, ConAgra had an express policy that it would not employ individuals with diabetes. And when ConAgra was informed that Mr. Rodriguez had uncontrolled diabetes, his fate was sealed because ConAgra expressly admitted, we withdrew your job offer because you had diabetes. No such admission, no such conduct happened in this case. Instead, we've got Dr. Holland conducting a fitness for duty evaluation, making findings about the safety risks associated with future sudden incapacitation, which, by the way, we're talking about somebody involuntarily losing their ability to control their faculties without any given notice. And he gave Carrillo a functional work restriction as a result. And I think another thing that to try to keep Mr. Carrillo from working for Union Pacific is the restrictions were limited to that five-year period, that critical five-year period where the risk for a future seizure is at its highest, 30 to 35 percent. And then after that five-year period, it goes down to a risk, annual risk of 2 to 3 percent. And the restrictions in Dr. Holland's analysis recognize that. And that's lawful. Could he have continued to do the job that he had without either moving trains or doing anything that involves placing others or himself at risk of an industrial or workplace accident? In other words, could he have done the job by being stationary and working by himself on whatever the project is? No. And there are several reasons for that. One, it is undisputed in the record that all diesel electricians at the El Paso facility were responsible for moving trains. And while, you know, Mr. Castor makes the point that, well, they move trains in pairs, so you could just assign somebody else to drive the train and Mr. Carrillo could have been the lookout on the ground, the purpose of the lookout on the ground is also to safely move the train. And so if Mr. Carrillo has a seizure while he's a lookout on the ground, it's no less of a safety risk than if he's the one driving the train. And also this idea that the trains are moving slowly because it's in a yard. You know, the court can look at the NTSB report from the Arden accident that's in the record. That train was moving at less than three miles an hour and it did $200,000 worth of damage and hit a building. We're talking about several hundreds of thousands of pounds of moving steel. And at any speed, it's exceptionally dangerous. Additionally, regardless of the moving of trains, they were operating or driving trucks around the yard to get to the various places where they're performing the repairs. And so that's a risk. And additionally, in performing the repairs themselves, the El Paso facility was one where the particular workshops were not of a size that they could have moving platforms or things like that where the diesel electricians could stand on while performing work at heights. Instead, they had to actually climb up on the top of the train. Yes, they had a harness as fall protection, but the evidence of the record and it's not disputed is that if you lose consciousness while you're wearing a harness and you're on top of a train, you're going to swing into the train because you don't have any ability to brace yourself or otherwise protect yourself from actually falling. So there are numerous ways in which Mr. Carrillo cannot perform the essential functions of the job safely if he had a seizure. I think also to that point, Mr. Castor made a statement that there's some type of split over whether there's a duty to accommodate somebody that's regarded as disabled. That's actually not the case. The ADA Amendments Act specifically sets forth that there is no duty to accommodate somebody that's proceeding solely under regarded as theory. So there's no, you know, the accommodation analysis just doesn't come into this case. And I'll note they had had a failure to accommodate claim that was dismissed early on in the lawsuit and that's not before the court. Ultimately, the district court concluded that there was no direct evidence of discrimination. They were required to prove that as an essential element of their claim. They've abandoned the McDonnell-Douglas framework and so this court should affirm the trial court's judgment. Thank you. Thank you, sir. Mr. Castor, you have five minutes of rebuttal time. Thank you, Your Honor. It's not correct that we abandoned the McDonnell-Douglas analysis. We certainly agree with the concurring opinion in Null over how the analysis should properly be done. But if you look at the majority opinion in Null and the concurring opinion, you'll see that they end up in the very same place. They look at the question of whether or not there's a material fact question on the direct threat. That is the analysis of pretext in the majority opinion and the concurring opinion, the direct evidence. They end up in the very same place. There is no waiver here. They're arguing for a new standard that was abandoned by the Supreme Court more than two decades ago in Reeves v. Sanderson, saying that you need pretext plus. In a unanimous Supreme Court opinion, the court said, no, you don't in a discrimination case. That's what they're arguing for here. In Rodriguez, the court said ill will is of no moment. Null addresses the same issue. Reeves v. Sanderson addresses the question. He applied for several jobs in yardmaster jobs, desk jobs. So the idea that they didn't only eliminate him from doing a diesel electrician job is simply not true. With respect What were reasons given if he had submitted himself for those jobs? Were there reasons given why he was not given those jobs? Or was it just the same, well, we have these restrictions and you don't qualify? One of the restrictions that he received was that he couldn't be involved in a job that had critical decision making. The Medical Commons history, which traces his history sort of blow by blow, talks about people saying, well, I can't accommodate, I can't work with that restriction. And Dr. Holland said, when he was asked to identify what job is that that doesn't involve critical decision making, he I think named one, maybe a janitorial position might not involve critical decision making. He even said the restriction was ambiguous and shouldn't have been imposed. But that was the restriction that was imposed. So in the old rubric under the ADA, it took him out of an entire class of jobs, any job at the railroad. With respect to the issues today, we're going to the question of direct threat. In the first Rizzo decision, the court called this a complicated fact question and not a question of law. What the facts in this case demonstrate is that on December 8th of 2017, Dr. Charbonneau made a conclusion that this sounded like a seizure. And that's the most they've ever said it, that it's likely. After 22 minutes, 22 minutes, then they never talked to him, they don't talk to the eyewitness, his wife. They do that on the basis of he's taking gabapentin, which is an anti-seizure medication, which doubles as a pain medication. He's taking it for pain, has been taking it for a couple of years, but they ignore that, they ignore the objective testing, they tell the outside reviewer from the UNO that it's likely a seizure, and then they issue restrictions before they get the opinion back. They get his job wrong. There's no question that this is not an individualized analysis. They not only do the paper record, they get his job wrong. They say he drives trains, he's a diesel electrician. They never talk to his supervisors about whether he can do the job, and they rely on the FMCSA handbook, which has been withdrawn by the very agency that promulgated it, to place him in categories. Where does the five-year restriction come from, from seizures? It's in the category, in the handbook, that is now no longer in use, hasn't been in use for years by the FMCSA. But they put him in a category, likely a seizure, they put him in a five-year category. That is exactly what Rodriguez et al. says you cannot do. It's not a question of whether or not a diabetic might pose a risk, it's this person. In an individualized analysis, it's not a question of whether or not Parkinson's might put somebody in a risk category, it's this person. This court has said so repeatedly that it has to be an individualized analysis. This is nothing like that. The direct threat is imminent. They have to make that decision. You have to find that there's an imminent safety threat. Let me go to Dr. Aguilar to the last note of January 2018, simply sends him back to his treater, the nurse, who has the Ph.D., Dr. Maya Saenz. The issue of him going to the Mayo Clinic is also addressed in the medical comments history. So he doesn't go. He's an out-of-work railroader. It's too far and too expensive. He can't go. All right. Thank you, Counsel. We have your arguments. Thank you for the briefing that you've done in this case and for appearing here today. We'll consider the case submitted.